James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

*Counsel for Plaintiff and the Proposed Class*
*(Additional Counsel on Signature Page)*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON MANIER individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>TRIPLELIFT INC., a New York Corporation.<br><br>*Defendant.* | Case No.: 5:25-cv-03223-SSS-DTB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1. **Violation of Cal. Penal Code § 631;**<br>2. **Violation of Cal. Penal Code § 638.51;**<br>3. **Violation of Cal. Penal Code § 502;**<br>4. **Violation of the California Constitution Art. 1, § 1;**<br>5. **Common Law Invasion of Privacy – Intrusion Upon Seclusion.**<br><br><br>**DEMAND FOR JURY TRIAL** |

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Sharon Manier ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendant TripleLift Inc. ("Defendant" or "TripleLift") for surreptitiously collecting consumers' web browsing activities. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief.

## NATURE OF THE ACTION

1.    This lawsuit challenges Defendant TripleLift's vast data surveillance of California residents' internet activities without their knowledge or consent.

2.    TripleLift is a data broker and advertising technology company that secretly tracks consumers across the internet through two mechanisms: (1) collection of data of website users and its dissemination to bidders in "real-time bidding" auctions, where the visitors never authorized TripleLift to collect and disseminate their information; and (2) deployment of tags, pixels, and persistent cookies through its advertising platform, which serve as the foundation for tracking, profiling, and user identification across sites and over time.

3.    TripleLift's surreptitious interception of users' communications violates California's wiretapping laws. Its systematic collection of IP addresses and routing information without a court order also violates California's pen register statute. And its unauthorized access to users' devices to extract personal data violates multiple other privacy protections under California law.

4.    Plaintiff brings this action on behalf of millions of Californians whose privacy has been invaded by TripleLift's unlawful tracking, seeking damages, restitution, and injunctive relief to stop these violations.

## PARTIES

5.    Sharon Manier is a citizen of California who resides in Riverside, CA.

6.    Defendant TripleLift Inc. is a New York corporation with its registered address at 53 W 23rd St, New York, NY 10010. TripleLift maintains an active presence throughout the United States and is registered as a data broker with the California Privacy Protection Agency.

## JURISDICTION AND VENUE

Second Amended Class Action Complaint                                                    -2-

7.      This Court has personal jurisdiction over Defendant because Defendant conducts significant business throughout the State of California. Moreover, TripleLift is a registered data broker in California, and it has purposefully directed its conduct toward California residents. Through the deployment of its tracking technology on widely accessed websites, TripleLift caused the unauthorized interception and collection of data from California residents while they were physically located in the state, constituting significant, continuous, and pervasive contacts with the State of California, including this District.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331(d)(2) (Class Action Fairness Act or "CAFA") because the amount in controversy of the proposed class claims exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different from Defendant.

9.      Venue is proper in this Court because Defendant transacts substantial business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims arose here.

## COMMON FACTUAL ALLEGATIONS

10.      TripleLift is a technology firm and registered data broker that operates in the world of "programmatic advertising," which refers to the automated process of buying and selling ad space online. TripleLift's business is to help its clients sell advertising space on their websites through high-speed, background auctions for ad space on websites . The company promises publishers that they will "get the most competitive price" for their "inventory."

11.      To carry out its business, TripleLift must gather information about internet users. To do so, it has developed a business model centered on the surreptitious surveillance and collection of consumer data through two primary channels.  First, it collects information through its central role in automated advertising auctions known as "real-time bidding," where it collects data about internet users across thousands of websites. Second, it deploys tags, pixels, and persistent cookies through its advertising platform, which serve as the foundation for tracking, profiling, and user identification across sites and over time.

12.      Through both mechanisms, TripleLift gathers sensitive personal information

---

Second Amended Class Action Complaint                                    -3-

without users' knowledge or consent, creating detailed profiles that it uses for commercial purposes.

**A.  Gathering and disseminating Personal Information Through Real Time Bidding**

13.      TripleLift collects vast amounts of user data through its role in the "real-time bidding" ("RTB") advertising ecosystem. This system enables TripleLift to gather personal information from users across thousands of websites.

14.      RTB is the automated auction system that determines which advertisements appear on digital spaces such as websites. When a user visits a webpage containing ad space, an auction occurs in the milliseconds before the page fully loads. During this auction, multiple advertising companies compete to show their ad to that specific user, with the highest bidder winning the right to display its advertisement. It is estimated that RTB is a $117 billion industry which tracks and shares what users view and real world location 178 trillion times a year in the US and Europe.[1]

15.      This RTB ecosystem, which is complex and opaque, involves several types of entities. Publishers are websites, apps, or digital platforms with advertising space to sell. Supply-Side Platforms ("SSPs"), like TripleLift, are technology companies that help publishers maximize ad space sales revenue by connecting them to multiple potential advertisers. As part of this service, TripleLift transmits information about ad slots and associated users into auctions, where Demand-Side Platforms ("DSPs") are the buyers. DSPs are hired by companies wanting to advertise their products and services online.

16.      Critically for privacy, during the auction process TripleLift transmits detailed user information to all potential bidders. When an RTB auction for digital-advertising space occurs, TripleLift sends "bid requests" to multiple DSPs. That request includes information such as the user's IP address, device information, geolocation, browsing context, and available identifiers. The DSPs will use this information to calculate whether and how much to bid in the auction. Each DSP receives this data regardless of whether they bid or win, transforming the RTB system into a

---

[1] Irish Council for Civil Liberties, *The Biggest Data Breach: ICCL report on the scale of Real-Time Bidding data broadcasts in the U.S. and Europe* (May 16, 2022), https://www.iccl.ie/news/iccl-report-on-the-scale-of-real-time-bidding-data-broadcasts-in-the-u-s-and-europe/ (last visited April 30, 2026).

Second Amended Class Action Complaint                                        -4-

massive data collection network.

**B. Tracking users with Tags, Pixels, and Persistent Cookies.**

17.    TripleLift's presence on publishers' pages typically takes the form of small pieces of code that include tags and pixels. When those tags or pixels run, the user's browser automatically makes network calls to TripleLift's servers, sending standard request headers (IP address, user-agent, referrer) and additional signals the code collects (page context, device/browser signals, and any readable identifiers). TripleLift uses those signals to build and forward bid requests to demand partners (the DSPs), which then evaluate and submit bids. Publishers integrate TripleLift's codes into their pages because it gives them access to more buyers, richer targeting, and monetization.

18.    In addition, TripleLift deploys "TLUID," a persistent cookie through its advertising platform, which serves as the foundation for tracking, profiling, and user identification across sites and over time. A cookie is a small text file that a web server instructs a browser to store on the user's device. Once stored, the cookie is automatically included in future communications with that server, allowing the server to recognize returning visitors.

19.    The operation of these tracking tools is an essential component of TripleLift's business model. Indeed, the more detailed the personal information TripleLift transmits in its bid requests, the more commercially attractive it becomes to potential bidders as it enables more accurate, individualized targeting of advertisements. In other words, bid requests that include rich user and device signals (e.g., device identifiers, IP/geolocation, browsing context and behavioral signals) allow DSPs to better predict value and conversion likelihood and therefore to submit higher, more competitive bids; that increased informational richness thus directly amplifies demand for, and the market value of, the ad opportunity.

*C. Cookie Syncing: The Foundation of Cross Platform Data Collection and Dissemination*

20.    To recognize users across domains and platforms, advertising entities engage in cookie syncing.  This process allows distinct systems (e.g., a DSP and an SSP) to align their respective user identifiers through server-side exchanges or client-side pixel fires. ID syncing is done via redirects, pixel calls and match tables—enabling persistent cross-site tracking before any

ad auction occurs. The process is widespread and not transparent, exposing user data to numerous unseen third parties without user awareness or control. ID syncing is essential for the RTB system to function efficiently, allowing all parties, from SSPs to DSPs, to benefit from user data circulation, while users remain unaware.

21.    Cookie syncing addresses a fundamental challenge: different companies assign different identifiers to the same user. A DSP might know a user as "User-123" while TripleLift knows the same user as "tl-user-id-ABC." Without synchronization, these platforms cannot coordinate their tracking and advertising efforts.

22.    The syncing process occurs automatically when users visit websites. Their browser is invisibly redirected through multiple advertising domains in rapid succession, often dozens of redirects within seconds. During each redirect, platforms read their tracking cookies, share identifiers with each other, and build translation tables.

23.    When TripleLift engages in cookie syncing during the RTB process, it enables DSPs to match the personal information they receive from TripleLift, with information the DSPs collected about the users across the internet. By establishing these identity connections, the RTB transforms to a platform where bids are priced by users' data across the entire internet.

24.    Indeed, when DSPs recognize a user through a synced identifier during an auction, they can instantly access its stored profile and bid strategically based on that user's browsing history, interests, and past website interactions. For instance, if a DSP knows that a user recently searched for "breast cancer" on a medical website, it can bid more aggressively when that same user appears on a news website, knowing the user may be receptive to medical device advertisements. Without cookie syncing, DSPs would be bidding "blind," resulting in lower offers for the advertising space TripleLift is selling.

25.    Moreover, cookie syncing allows DSPs to enrich the user profiles they hold regardless of auction outcomes. Every bid request contains fresh information about users' current activities—which websites they're visiting, when, and from where. This information is transmitted to the DSPs at no cost. This free valuable data makes participation in the bidding process more lucrative resulting in more competitive bidding.

26.     Notably, individuals whose personal data is shared with bidders face imminent risk that their data will be sold and misused. Indeed, a letter penned by a group of bipartisan United States Senators noted that: "While only one company will win the auction, hundreds of firms participating receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender … Few Americans realize that some auction participants are siphoning off and storing "bidstream" data to compile exhaustive dossiers about them. In turn, these dossiers are being openly sold to anyone with a credit card, including to hedge funds, political campaigns, and even to governments."[2]

27.     Further raising alarm to this risk, last year, the Chair of the U.S. Federal Trade Commission warned that "the ease with which real-time bidding technology can be exploited to surveil Americans should raise serious alarm. Researchers report that no real safeguards limit who can access, harness, or retain this data, suggesting that the multi-billion-dollar industry built around targeted advertising may presently leave Americans' sensitive data extraordinarily exposed."[3]

28.     The extent of data collected by TripleLift is of particular concern. The company boasts that it works "with 99% of the top publishers globally, offering billions of impressions across trusted content." And its trackers have been found in 1539 of the 10,000 sites with the highest traffic worldwide.[4]

29.     Furthermore, TripleLift's bidder tags, tracking pixels, and RTB endpoints are present in websites where users seek highly private and sensitive information. By way of example, Health.com is a health and wellness website that provides articles, tips, and resources on topics

---

[2] Letter from Ron Wyden et al. to John Stankey, Chief Executive Officer, AT&T Inc. (Apr. 1, 2021), https://www.cassidy.senate.gov/wp-content/uploads/media/doc/040121%20Bidstream%20Letter%20to%20ATT.pdf

[3] Lina M. Khan, Statement of Chair Lina M. Khan Joined by Commissioner Alvaro M. Bedoya & Commissioner Rebecca Kelly Slaughter, In the Matter of Mobilewalla, Inc., Commission File No. 2023196 (Dec. 3, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/statement-khan-bedoya-slaughter-mobilewalla.pdf

[4] Ghostery, *TripleLift*, WhoTracks.Me (last visited April 30, 2026) https://www.ghostery.com/whotracksme/trackers/triplelift

Second Amended Class Action Complaint                                    -7-

such as sexual health, reproductive health, and mental health.  When a user visits Health.com, multiple RTB auctions are triggered for the available ad spaces on the site. In these auctions, TripleLift functions as a supply-side platform. As part of this role, it collects the page URL, device characteristics, the user's IP address, and location. TripleLift uses this information to optimize its bidding strategy in the RTB process. This occurs without informing the user or obtaining their consent, allowing TripleLift to auction the user's attention to advertisers based on their profile.

**D. Lack of User Consent.**

30.     Throughout all of these data collection activities, TripleLift operates without user consent. When users visit websites participating in RTB, they have no knowledge that TripleLift is collecting their personal information. Users are never presented with TripleLift's privacy policy, never agree to TripleLift's data collection, and have no opportunity to opt out before their data is transmitted to TripleLift's servers.

31.     The data collection begins immediately when a webpage loads, before users can review any privacy policies or make choices about tracking. Even when users consent to a website's own privacy policy, this does not constitute consent for TripleLift's separate commercial data collection. Users do not expect that visiting a medical website means agreeing to have their health searches shared with a digital advertising company they've never heard of.

32.     Most users remain entirely unaware that TripleLift exists, much less that it maintains detailed profiles about them. They cannot consent to something they do not know is occurring.

**E.  Commercial Exploitation of User Data**

33.     TripleLift monetizes the personal information it collects by operating as a data-driven advertising space sales platform. The company uses the profiles it builds without consent to offer increasingly sophisticated bid requests in order to maximize ad inventory sales revenue.

34.     The scale of TripleLift's commercial exploitation is substantial. The company generates approximately $130 million in annual revenue. And in 2021, Vista Equity Partners acquired a majority stake in TripleLift, reportedly investing $1.4 billion.

35.     TripleLift's registration as a data broker with the California Privacy Protection

Agency confirms the commercial nature of its data operations. As a registered data broker, TripleLift acknowledges that it collects personal information about consumers with whom it does not have a direct relationship and sells or licenses that information for commercial purposes. This registration places TripleLift squarely within California's regulatory framework for companies that traffic in personal data as a business model.

**F. TripleLift's Knowledge and Conduct Regarding User Consent**

36.    TripleLift's interception of users' communications was the predictable and intended result of the ordinary operation of its tracking technologies, which were designed to receive and process those communications in real time for TripleLift's advertising and monetization purposes.

37.    TripleLift's tracking technologies are designed to begin collecting user data immediately upon page load. When a user's browser loads a webpage containing TripleLift's code, TripleLift's bidder tags, tracking pixels, and RTB endpoints execute automatically and cause the browser to transmit the user's IP address, URLs, search terms, referrers, device information, browsing data, and other personal information to TripleLift's servers. This interception occurs before the user has any opportunity to review a privacy policy, provide consent, or take any action to control the collection of their data.

38.    Upon information and belief, TripleLift has not implemented any technical mechanism to delay, condition, block, suppress, or prevent data collection pending verification that a user has been informed of TripleLift's presence on a website or has affirmatively consented to the interception of their communications.

39.    Upon information and belief, TripleLift does not audit, monitor, or otherwise verify whether the websites on which its tracking technologies are deployed inform users of TripleLift's data collection activities or obtain user consent for such collection.

40.    Upon information and belief, TripleLift does not employ any back-end filtering, screening, or technical safeguard to identify or exclude data collected from users who have not consented to its tracking. Once user data is transmitted to TripleLift's servers, TripleLift processes and monetizes that data in the ordinary course of its business for profiling, bid-request enrichment,

cookie syncing, audience segmentation, and other commercial purposes, regardless of whether the user was aware of or consented to TripleLift's collection.

41.     TripleLift knew that its tracking technologies were deployed on websites where users access highly sensitive personal information, including health and wellness websites such as Health.com and Prevention.com. Despite that knowledge, TripleLift did not implement meaningful technical measures to exclude such websites, suppress transmission from sensitive pages, or prevent interception of sensitive communications on those sites.

<strong>FACTS SPECIFIC TO PLAINTIFF</strong>

42.     During the Class Period, Plaintiff visited one or more websites (specifically, www.prevention.com and www.weather.com) that deployed TripleLift's tracking technologies.  On www.prevention.com, for example, Plaintiff used the search bar to search for information regarding her personal health and read articles on the website. Plaintiff's personal information, including her IP address, device information, browsing activity, and persistent user identifier, was intercepted and collected by TripleLift.

43.     Upon information and belief, TripleLift identified Plaintiff and created a profile or profiles containing her likes and interests and shared personal information as part of its bid requests.

44.     Plaintiff did not know, nor had reason to know, that unknown third party TripleLift surreptitiously collected and disseminated information about her web activity (including her IP addresses) and created profiles about her likes and interests.

45.     Plaintiff did not know that TripleLift was collecting her personal information when she visited these websites. Plaintiff never gave TripleLift' consent to intercept her communications and collect data about them.

<strong>CLASS ACTION ALLEGATIONS</strong>

46.     **Class Definition**: Plaintiff brings this proposed class action pursuant to California Code of Civil Procedure § 382 on behalf of herself and a Class of others similarly situated, defined as follows:

> All California residents who visited a website with TripleLift's surveillance technology, including bidder tags, tracking pixels, and RTB endpoint, or who otherwise had their personal information collected by TripleLift through its technology, during the Class Period.

---

Second Amended Class Action Complaint                                                -10-

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) 'Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

47.    **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant has surreptitiously collected and analyzed data from hundreds of thousands, if not millions, of consumers who fall into the definition of the Class. Class members can be identified through Defendant's records.

48.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    A.    Whether Defendant read, attempted to read, or learned the content of the communications made by Plaintiff and the Class;

    B.    Whether Defendant's actions were willful;

    C.    Whether Defendant had the capability to and/or used Plaintiff's' and the Class members' communications for its own purposes,

    D.    Whether Defendant's software is a pen register;

    E.    Whether Defendant accessed Plaintiff's' and the Class members' computer systems; and

    F.    Whether Defendant obtained consent from Plaintiff and Class members.

49.    **Typicality**: Plaintiff's' claims are typical of the claims of the Class members in that Plaintiff, like all Class members, have been injured by Defendant's misconduct at issue.

50.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the

Class. That is, Plaintiff and the Class members sustained damages as a result of Defendant's conduct. Plaintiff also has no interests antagonistic to those of the Class, and Defendant have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

51.     **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

52.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of Cal. Penal Code § 631**
**(On behalf of Plaintiff and the Class)**

53.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

54.     To establish liability under the California Invasion of Privacy Act ("CIPA"), § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this

state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

55.     Defendant's technical components, including bidder tags, tracking pixels, and RTB endpoints are "machine[s], instrument[s], [and] contrivance[s]..." used to collect communications.

56.     When Plaintiff and Class members communicate with websites by entering search terms, clicking links, or viewing pages, these interactions constitute communications containing content and meaning. This includes URLs visited, search terms entered, webpage content accessed, and user interactions, all of which are "contents" of communications under CIPA.

57.     Defendant, through components such as bidder tags, tracking pixels, and RTB endpoints, intercepts these communications while they are in transit. Specifically, when users interact with a website, the Pixel causes their browsers to simultaneously transmit the contents of those communications to TripleLift's servers. This interception occurs in real-time as users' communications are being sent to the intended website.

58.     Defendant willfully read, analyzed, and learned the contents and meaning of these intercepted communications. The transmitted data is processed by TripleLift systems to extract URLs, search terms, user interactions, and other communication contents, which Defendant uses to build detailed user profiles to provide detailed Bid Requests.

59.     Plaintiff and Class members did not consent to Defendants intercepting, reading, or using their communications. No notice was provided, and no opportunity to consent was given before the interceptions began.

60.     Defendant uses the intercepted communications for its own commercial purposes, including building user profiles, enhancing advertising services, and generating revenue. This use demonstrates that Defendant is not acting as a mere extension of the websites but as an independent

---

Second Amended Class Action Complaint                                                    -13-

party exploiting intercepted communications.

61. Defendant's systematic interception and use of Plaintiff's and Class members' communications while in transit violates Cal. Penal Code § 631(a).

62. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the Class seek statutory damages of $5,000 per violation and injunctive relief.

**SECOND CAUSE OF ACTION**
**Violation of Cal. Penal Code § 638.51**
**(On behalf of Plaintiff and the Class)**

63. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64. California law prohibits the installation of a pen register without first obtaining a court order. Cal. Penal Code § 638.51.

65. The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

66. Defendant's bidder tags, tracking pixels, and RTB endpoints constitutes use of a "pen register" because it is a process through which Defendant record addressing and signaling information—specifically, Plaintiff's and Class members' IP addresses, the websites they visited, derived location information, device identifiers, and other routing data—from electronic communications transmitted by their devices. Defendant can systematically identify consumers, gather routing information, and correlate this data across multiple websites and devices.

67. Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class members' locations and personal information, nor did it obtain consent from Plaintiff and the Class members to operate such a device.

68. Plaintiff and the Class seek injunctive relief and statutory damages in the amount of $5,000 per violation pursuant to Cal. Penal Code § 637.2.

Second Amended Class Action Complaint                                    -14-

### THIRD CAUSE OF ACTION
**Violation of the California Comprehensive Computer Data Access and Fraud Act
Cal. Penal Code § 502
(On behalf of Plaintiff and the Class)**

69.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

70.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA") to "expand the degree of protection afforded to individuals... from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). In enacting the statute, the Legislature emphasized the need to protect individual privacy: "The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." *Id*.

71.    Plaintiff's and Class Members' devices are "computers" or "computer systems" within the meaning of § 502(b) because they are devices capable of being used in conjunction with external files and perform functions such as logic, arithmetic, data storage and retrieval, and communication.

72.    Defendant violated the following sections of CDAFA § 502(c) because it:

(a)    "Knowingly accesses and without permission... uses any data, computer, computer system, or computer network in order to... wrongfully control or obtain money, property, or data." *Id*. § 502(c)(1).

(b)    "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network." *Id*. § 502(c)(2).

(c)    "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." *Id*. § 502(c)(7).

73.    Defendant knowingly "accessed" Plaintiff's and the Class Members' computers and/or computer systems because it purposefully gained entry to and/or caused output from their computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies.

74.    Plaintiff and the Class suffered damage and/or loss resulting from Defendant's

---

Second Amended Class Action Complaint                                                    -15-

conduct described herein. Specifically: (1) Defendant's software occupied Plaintiff's and the Class members' storage space on their devices without authorization; (2) Defendant's software caused data to be output from Plaintiff's and the Class members' devices; (3) Defendant's acts used computer resources of the device; and (4) Defendant was unjustly enriched and profited from the data taken from Plaintiff and the Class.

75.     Plaintiff and the Class now seek compensatory damages, injunctive relief, disgorgement of profits, other equitable relief, punitive damages, and attorneys' fees pursuant to § 502(e)(1)–(2).

### FOURTH CAUSE OF ACTION
### Invasion of Privacy
### Violation of Art. 1, § 1 of the California Constitution
### (On Behalf of Plaintiff and the Class)

76.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

77.     "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

78.     The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

79.     Plaintiff and Class members have a legally protected privacy interest in their IP addresses, location data, and other routing information that TripleLift captures without notice or consent when they access and view websites implementing TripleLift's tracking technologies. These privacy interests are recognized by the California Constitution, CDAFA, and CIPA.

80.     Plaintiff and Class members had a reasonable expectation of privacy concerning this data when navigating the internet. TripleLift is a third-party data broker with whom Plaintiff and

---

Second Amended Class Action Complaint                                    -16-

Class members have no direct relationship, and TripleLift and its client-websites use Plaintiff's and Class members' online activities to collect their IP addresses, location data, device information, and other routing information across multiple unrelated websites. TripleLift also uses this information to build comprehensive profiles of their online activities.

81.     The identifiable and private information TripleLift intercepted, stored, and used without Plaintiff's and Class members' consent was used to track them consistently and persistently across multiple websites and to serve targeted advertisements. The manner in which TripleLift intercepted this information deliberately circumvented established privacy-protection mechanisms and violated social norms.

82.     Defendant's conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person because: (i) the information collected by TripleLift is personally identifying information protected by the California Constitution and numerous statutes; (ii) TripleLifts creates and enables the creation of comprehensive profiles of users by linking their activities across multiple unrelated websites and across multiple devices; (iii) Defendant did not have authorization or consent to collect users' IP addresses and other routing information; and (iv) this invasion deprived Plaintiff and Class members of the ability to control the dissemination and use of their personal information, an ability that is a fundamental privacy right.

83.     Reasonable individuals do not expect that there is an entity intercepting and monitoring their personally identifiable online activity across multiple websites, let alone using this information for profit through its cookie syncing and behavioral targeting services.

84.     Defendant's conduct violated the privacy of hundreds of thousands (if not millions) of Class members, including Plaintiff. Defendant did not have consent to intercept this information, let alone use and monetize it.

85.     As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind and the loss of control over their personal information.

86.     Plaintiff and Class members seek appropriate relief for those injuries, including but not limited to restitution, disgorgement of profits earned by Defendant because of, by way of or in

---

Second Amended Class Action Complaint                                    -17-

connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

87.    Plaintiff also seek such other relief as the Court may deem just and proper.

### FIFTH CAUSE OF ACTION
### Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class)

88.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

89.    To state a claim for intrusion upon seclusion, Plaintiff must establish that: (1) the defendant intruded on a place, conversation, or matter in which Plaintiff had a reasonable expectation of privacy; and (2) the intrusion would be highly offensive to a reasonable person.

90.    Defendant's collection, interception, and use of Plaintiff's and Class members' personally identifiable information, including IP addresses, location information, and device identifiers constitutes an intentional intrusion. TripleLift's use of this information to create detailed profiles of individuals through its cookie syncing which tracks and profiles Plaintiff and Class Members across multiple unrelated websites, likewise constitutes an intentional intrusion.

91.    Plaintiff and Class members reasonably expected that their IP addresses, location data, and other personal information would not be intercepted, collected, and used by TripleLift—a third-party data broker with whom they have no direct relationship.

92.    This expectation is particularly reasonable given that TripleLift operates entirely behind the scenes, with no visible interface for users, no direct services provided to users, and no opportunity for users to review or consent to TripleLift's privacy practices.

93.    The information TripleLift collects is especially sensitive because it includes IP addresses (which reveal users' geographic locations) and is used to create comprehensive profiles tracking users' activities across multiple unrelated websites.

94.    Plaintiff and Class members did not consent to, authorize, or understand TripleLift's interception or use of their private data.

95.    Defendant's conduct is highly offensive to a reasonable person because: (a) it

---

Second Amended Class Action Complaint                                    -18-

violates established social norms and expectations regarding online privacy; (b) it occurs without users' knowledge or consent and provides no opportunity for users to opt out; (c) it creates comprehensive profiles of users' online activities across multiple unrelated websites and across devices through TripleLift's cross-device targeting technology; and (d) it monetizes users' personal information for Defendant's commercial gain without their knowledge or compensation.

96.    Defendant's conduct caused Plaintiff and Class members harm, including a violation of their privacy interests, loss of control over their personal information, and emotional distress from the knowledge that their online activities have been secretly monitored and profiled.

97.    Plaintiff and Class members seek damages to compensate for the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Defendant as a result of its intrusion upon seclusion.

98.    Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

99.    Plaintiff and Class members also seek any other relief the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sharon Manier, individually and on behalf of the Class, prays for the following relief:

(a)    An order certifying the Class as defined above, appointing Plaintiff' as the representative of the Class and appointing her counsel as Class Counsel;

(b)    An order declaring that Defendant's actions, as set out above, violate Cal. Pen. Code § 631, Cal. Penal Code § 638.51, Cal. Pen. Code § 502, and Art. 1, § 1 of the California Constitution, and constitute a common law invasion of privacy.

(c)    An injunction requiring Defendant to cease all unlawful activities;

(d)    An award of statutory damages, disgorgement of profits, punitive damages, costs, and attorneys' fees;

(e)      Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.


                                        Respectfully submitted,


Dated: May 1, 2026                      By: */s/ James C. Shah*
                                        James C. Shah (SBN #260435)
                                        Email: jcshah@millershah.com
                                        Kolin C. Tang (SBN #279834)
                                        Email: kctang@millershah.com
                                        **MILLER SHAH LLP**
                                        8730 Wilshire Blvd., Suite 400
                                        Los Angeles, CA 90211
                                        Telephone: (866) 540-5505
                                        Facsimile: (866) 300-7367

                                        Kyle Shamberg
                                        **CARROLL SHAMBERG, LLC**
                                        111 W. Washington Street, Suite 1240
                                        Chicago, IL 60602
                                        kyle@csclassactions.com
                                        (872) 215-6205

                                        **DON BIVENS PLLC**
                                        Don Bivens (*pro hac vice* forthcoming)
                                        15169 N. Scottsdale Road, Suite 205
                                        Scottsdale, AZ 85254
                                        Telephone: (602) 762-2661
                                        don@donbivens.com

                                        *Counsel for Plaintiff and the Proposed Class*

Second Amended Class Action Complaint                                    -20-